647 So.2d 1348 (1994)
Mary Alice HALL, Testamentary Executrix of the Succession of Barry Stephen Hall
v.
FERTILITY INSTITUTE OF NEW ORLEANS, a PROFESSIONAL CORPORATION.
No. 94-CA-1135.
Court of Appeal of Louisiana, Fourth Circuit.
December 15, 1994.
Jeanmarie LoCoco Nicholson, Cecily Salter Salley, New Orleans Ass'n for Women Attys., New Orleans, amicus curiae.
*1349 Charles A. Boggs, Betty P. Westbrook, Boggs, Loehn & Rodrigue, Walter C. Thompson, Jr., Barkley & Thompson, L.C., New Orleans, for defendant/appellant.
A.D. Freeman, A. Albert Ajubita, Byron Ann Cook, New Orleans, for plaintiff/appellee.
Before WARD, JONES and WALTZER, JJ.
WALTZER, Judge.

STATEMENT OF THE CASE
Mary Alice Hall ("Executrix" hereinafter), the duly appointed testamentary executrix of the Succession of her son, Barry S. Hall, sued the Fertility Institute of New Orleans ("Institute" hereinafter) for a declaratory judgment declaring Hall's frozen semen on deposit with the Institute to be Succession property; alternatively asking that the material be destroyed; and for temporary, preliminary and ultimately permanent injunctive relief preventing the release of the material absent a court order. The trial court preliminarily enjoined the Institute from releasing the material.
Christine C. St. John intervened, alleging ownership of the material pursuant to a formal written act of donation executed by Hall on 29 November 1992, claiming to be an indispensable party to the litigation, and seeking dissolution of the preliminary injunction.
The Executrix filed a supplemental and amended petition adding St. John as a party defendant, asserting the nullity of the act of donation.
On 4 March 1994, the trial court granted St. John's motion to dissolve the preliminary injunction and temporarily restrained the parties from taking any action with respect to the genetic material. An evidentiary hearing was held on the Executrix' motion for a preliminary injunction, following which the trial court entered judgment in favor of the Executrix and against St. John and the Institute, prohibiting St. John from taking possession, directly or indirectly, of Hall's frozen sperm, from authorizing or directing that any doctor or medical facility take any action with respect to the sperm except to destroy or deliver it for destruction to the Executrix, and from donating, transferring or delivering the frozen sperm to any person, firm or corporation, and from attempting, directly or indirectly, by the use of medical facilities to fertilize a human egg or eggs with the sperm, pending further orders of the trial court. The Institute was prohibited from releasing or injecting any deposits of Hall's sperm pending further court orders. From that judgment, St. John appeals.[1] We affirm.

STATEMENT OF FACTS
Hall died on 29 October 1993 of metastatic cancer. He was survived by a son, his sole heir under a will dated 18 September 1993. Following diagnosis of his disease, Hall and St. John on 13 January 1992 consulted Dr. Richard Dickey of the Institute, according to St. John's affidavit, to discuss the effects of contemplated chemotherapy on Hall's ability to father children and to find out about preserving his sperm deposits for St. John's artificial insemination at a later date. According to Dickey's deposition, sperm deposits were taken and tests thereon were made from January through 13 March 1992, totalling 15 vials. The doctor saw St. John last on 5 February, at which time preparations for beginning an insemination cycle were started. On 17 March 1992, St. John notified Dickey that she would not pursue further attempts at pregnancy for at least three months. There was no further contact by Hall or St. John with the Institute or Dr. Dickey, and the vials of Hall's sperm remain on deposit at the Institute. St. John was billed for and paid the Institute's 1992 storage fee.
*1350 On 29 November 1992, Hall and St. John executed an Act of Donation before St. John's law partner, Michael Guarisco, by which Hall purported to convey his interest in his frozen semen deposits to St. John, in consideration of his "love and affection" for her. On 25 October 1993, Hall executed a living will, again before Guarisco, appointing St. John as his health care agent, and appointing his mother as successor health care agent. Hall's sister, Donna Hall-Whitlock witnessed the living will, declaring her belief that Hall was of sound mind at that time.
Only affidavit and deposition evidence was taken at the hearing on the motion for a preliminary injunction. In affidavits, the moderator and four members of a Cancer Support Group/Wellness Group in which Hall participated prior to his death said Hall had told them he could not marry St. John because of his illness, but had deposited sperm in order that she could have the option to bear a child by him. The notary who executed Hall's will declared by affidavit that on the occasions when he met with Hall in August and September of 1993, Hall was lucid and competent. To the same effect is Guarisco's affidavit. Hall's primary care physician declared by affidavit that on all occasions that she met with Hall or spoke with him by telephone, "he appeared coherent and capable of making rational decisions."
Michael Hall, Hall's only child, provided an affidavit asserting his wish, as next of kin, to bury all his father's remains, including the semen deposits. Michael asserted his belief that had Hall wished to father children by St. John, Hall would have married her, impregnated her before undergoing treatment, or allowed her to be artificially inseminated while he was alive. He also declared the extreme emotional upset, embarrassment and anger he suffers at the prospect of posthumous creation of blood relatives.
Hall's sister, Donna Hall-Whitlock, signed an affidavit declaring that Hall's surviving family were his son, his mother, and his sisters, Marsha Hall Hartman and herself. Donna declared that "toward the end", Hall was not responsible for his actions, was heavily sedated against pain and at all times under St. John's dominant influence. Donna also stated that she, her sister and her mother were Hall's primary caretakers during the two years of his illness, and that St. John disclaimed responsibility for Hall. Donna said Hall told her the semen deposit was intended for use when he finished treatment and was cured. She also said that had Hall wished to marry and have a family with St. John he would have done so. The affidavits of Hall's sister, Martha, and of his mother are similar in content.
While the record does not contain the trial court's reasons for judgment, we conclude that the judgment reflects the trial judge's determination, based on the conflicting affidavit evidence, that a preliminary injunction should issue to preserve the status quo until the issue of Hall's competency and intention could be determined in a full trial on the merits.

STANDARD OF REVIEW
We are mindful that this matter is before us on appeal of a judgment granting a preliminary injunction. The standard of appellate review in this circumstance was recently set out in Burnham Broadcasting Company v. Williams, 629 So.2d 1335, 1338 (La.App. 4th Cir.1993), writ denied, 632 So.2d 770 (La.1994), cert. denied, ___ U.S. ___, 115 S.Ct. 69, 130 L.Ed.2d 25 (1994):
"La.C.C.P. art. 3601, relative to the grounds for issuance of an injunction, provides, in pertinent part, as follows:
`An injunction shall issue in cases where irreparable injury, loss, or damage may otherwise result to the applicant, or in other cases specifically provided by law....
`During the pendency of an action for an injunction the court may issue a temporary restraining order, a preliminary injunction, or both, except in cases where prohibited....'
"In order to prevail at a hearing for preliminary injunction, the moving party must *1351 show two (sic) things: (1) that the injury, loss or damage he will suffer if the injunction is not issued may be irreparable; (2) that he is entitled to the relief sought; and (3) that he will be likely to prevail on the merits of the case. General Motors Acceptance Corp. v. Daniels, 377 So.2d 346 (La. 1979); Franz v. Cormier, 579 So.2d 1201 (La.App. 5th Cir.1991). Only a prima facie showing is required; therefore, the petitioner is required to offer less proof than is necessary in an ordinary proceeding for permanent injunction. Id. Since a preliminary injunction is an interlocutory procedural device designed to preserve the status as it exists between the parties pending trial on the merits, a trial judge has great discretion to grant or deny the relief requested. Id."
We find no merit in the Executrix' arguments that the authentic act of donation should be set aside for reasons of public policy, and reject the notion that St. John's proposed artificial insemination would be contra bonos mores in this State. Similarly, we are not called upon to address the constitutional propriety of artificial insemination in vitro or in utero, or the question of posthumous reproduction set out with great erudition in the amicus curiae brief filed herein. The sole issue relevant to disposition of the instant case is the validity vel non of the authentic act of donation that purports to convey to St. John the decedent's fifteen vials of sperm now on deposit with the Institute. If it is shown at trial that decedent was competent and not under undue influence at the time the act was passed, the frozen semen is St. John's property, and she has full rights to its disposition.
Applying this analysis to the facts of this case, we conclude that the trial court did not abuse its "great discretion" in granting a preliminary injunction to the Executrix herein. We find the Burnham Broadcasting test to be met in this case.
We have examined the consequences should preliminary injunctive relief be denied, and find the potential consequences to constitute irreparable harm. Should St. John be allowed to obtain Hall's sperm deposits during the pendency of this action, one or more embryos could well come into existence. Depending on the length of time the matter requires prior to final conclusion, the possible development of human beings is such a serious consequence that the irreparable nature of the risk at issue is clear. The emotional damage to the decedent's mother and Executrix should the donation prove to have been illegally obtained and children sired against the wishes of her dead son is obvious and cannot be compensated adequately. Further, the determination of the validity of the act of donation should be made without the influence of the existence of embryos or an actual pregnancy.
The determination of the validity of the Act of Donation is a factual issue that must be determined by a full trial on the merits, particularly where the preliminary injunction hearing produced conflicting affidavit and deposition evidence on this issue. The Executrix, representing the Succession, is the proper party to claim and preserve succession assets, and presents a prima facie entitlement to possession of the frozen material. Her likelihood of prevailing on the merits will depend on the validity of the act of donation, a mixed question of fact, addressing Hall's competency and intent, and of law, under the applicable statutes. We find it reasonable that the trial court apparently concluded that the Executrix presented a prima facie case that the Act of Donation was invalid. Among the factors raised by the deposition and affidavits touching the issue of donative intent are the following:
1. Evidence that Hall deposited his sperm prior to undergoing chemotherapy, the effects of which could damage the sperm cells, in order that he might father a healthy child after his own recovery from his disease.
2. Hall left nothing to St. John under his will. The trial court is thus asked to conclude that Hall intended to father a posthumous child but not to provide for its welfare from his resources. The record does *1352 not contain evidence of either inter vivos arrangements by decedent for the benefit of posthumous children or the lack of necessity of those arrangements for other reasons.
3. St. John advised Dr. Dickey that plans for her impregnation were no longer immediate and neither Hall nor St. John had further contact with the Institute.
4. St. John and the decedent apparently chose not to begin the insemination process prior to his death, when there would be no question of the legality of the action. Had Hall intended to father a child even were he to die of his disease, would he not have wished to begin the process during his life in order to avoid the publicity and acrimony that have attended the posthumous conception process?
5. The Act of Donation was procured through the offices of St. John's law partner, rather than through a disinterested attorney. The Executrix may be able to prove at trial her allegations that the decedent was sufficiently ill and dependent upon St. John at the time the act was executed that he was not aware that it was an unconditional donation or did not freely give his consent thereto.
Any of these illustrative concerns could form a basis for the trial court's belief that the Act of Donation might be proven at trial to be invalid, and serve as a foundation for his discretionary grant of preliminary injunctive relief. We express no opinion on the preponderance of the evidence that will be adduced at a full trial on the merits, but we believe that the trial judge did not abuse his discretion in preserving the status quo pending that trial.

SUFFICIENCY OF BOND
St. John contends, in the alternative, that the preliminary injunction must be vacated because the Executrix failed to post bond "and/or the amount of the security set by the trial court is inadequate." This specification of error is without merit.
LSA-C.C.P. art. 3610 provides in pertinent part:
"A ... preliminary injunction shall not issue unless the applicant furnishes security in the amount fixed by the court,.... The security shall indemnify the person wrongfully ... enjoined for the payment of costs incurred and damages sustained."
The record reflects that the trial court set bond in the amount of $1,000, and that the Executrix deposited that sum in cash into the registry of the Civil District Court for the Parish of Orleans. Such a procedure is allowed by LSA-C.C.P. art. 5121 which provides in pertinent part:
"... When the party required to furnish [security] is a plaintiff, a cash bond may be furnished in lieu of other security, at his option...."
It is well established that the amount of the bond addresses itself to the discretion of the trial court. Glidden v. Loe, 192 So.2d 633 (La.App. 2nd Cir.1966).
There is nothing in the record to show that St. John filed a motion seeking to increase or test the security given by the executrix, pursuant to the mandatory language of LSA-C.C.P. art. 5123, which provides in pertinent part:
"Any person in interest wishing to test the sufficiency, solvency of the surety, or validity of a bond furnished as security in a judicial proceeding shall rule the party furnishing the bond into the trial court in which the proceeding was brought to show cause why the bond should not be decreed insufficient or invalid, and why the order, judgment, writ, mandate, or process conditioned on the furnishing of security should not be set aside or dissolved...." Emphasis added.
Having failed to comply with the mandatory provisions of the Code of Civil Procedure to seek redress in the trial court, St. John may not raise her dissatisfaction with the sufficiency or validity of the cash bond in this Court.

CONCLUSION
We find no abuse of the trial court's discretion in the decision to maintain the status *1353 quo while a full and complete determination of the validity of the act of donation may be made without the possible complication and distraction of the existence of human embryos or more developed offspring.
AFFIRMED.
NOTES
[1] The Institute took a "precautionary appeal" to preserve the rights of all parties to a final determination of the issues herein and to avoid any question of whether St. John would be entitled to the relief she seeks on appeal in the absence of an appeal by the Institute.